Microsoft and Dell, 2007-13-34, Mr. DeMaris. Yes, Your Honor. Thank you. Good morning. May it please the Court. This appeal presents claim construction issues for two patents, where in both cases the Court interpreted the claims to rule out the sole embodiment described in the patent specification. That's supposed to be a rare event in patent law that happened in both of the patents in this case. Taking the Acronym 131 patent first, the District Court interpreted the broad term terminal device, which is a common term of art well known in the field, to be limited to its functions that the Court actually took out of the detailed description. Well, the specification in at least a couple of places where I've seen indicated the meaning that the trial court gave to it. And there was some prosecution history in which your patentee argued distinction over the buzz boom reference. Yes, Your Honor. Let me take both of those two statements in turn, because where the District Court got the term or the phrase that it used to limit the claim was actually the Court was misreading the specification. That section of the specification actually started out with the phrase, the sentence the Court took, the preceding sentence said, a station set, such as Station Set 10, may have one or more limitations. Are you talking about Column 6? I'm talking about Appendix Section 475, 8475. That's Column 6 of the patent. Column 6, line 59. Okay. It says a Station Set 10 may have one or more limitations, namely, the size of its associated display and internal memory. That leads into the next sentence, which the Court took. It's important to note, though, what it's talking about there is the size of the terminal display, not where things are going to be located. And then it says in the next sentence, the one the Court used, in accord with the principles of the invention, a terminal that is communicating with transaction processor 200 manages its associated display itself. What it's talking about there is taking a chunk of text. That's what the trial court stated in its time construction, wasn't it? Yeah, but it's misreading what that means. What that's talking about, if you look at the sentence before, there was this ability of the terminal to tell the host processor, I can only display so much text at a time, so I'll send you a chunk size, and then you send me only that much information that I can put on. That's why it says in the preceding sentence, the associated, namely, the size of its associated display. And then the next sentence says that the terminal is going to manage that display, and then the following sentence, the very next one says, in particular, during the exchange of session and connected messages, the station sends a value chunk size, and it tells you how much text you can display, not where you're going to display it. That's the key distinction. So not only did the Court take that sentence out of the detailed description, where the lead-in said it may have this limitation, but then the Court misread it from being a display. How do we know that's the case? If we look at the rest of the patent broadly, the background distinguishes prior systems that said specifically where things are going to be displayed. Right then, in the summary of the invention, they say that you can have different terminals, workstations, and smartphones, with declining terminal stations said broadly, and then all throughout the patent... Yeah, but it also says that the terminal device displays the object in a form determined solely by the terminal device. Actually, if you continue reading on, it says solely by the terminal device, but in accordance with respective predefined policies. Why is that important? Later in the detailed description, it tells us what those policies are, and if you look at column three, lines 53 to 58, it says, that Processor 200 then begins transmitting a series of objects. These objects are interpreted by Station Set 10 in accordance with a set of predefined specifications or policies relating to the way different types of objects or symbols should be presented to a user, i.e., displayed on the display. So the patent defines that... How about column eight? Column eight, lines Right. And isn't that supportive of the plant construction? Only if read properly in the full scope of the specification. What the specification tells us time and time again is the host processor will send commands to the terminal that will tell the terminal relatively how to display things. The terminal then decides where on the display it's going to be, so there's a distinction all throughout the specification between where exactly it's going to be and relatively, and I can give you some examples, as we just described. So that's your answer to the bus boom question, which Judge Lori started with. It's exactly what distinguishes bus boom. Bus boom said, display this object at row X, column Y, and that's exactly what was distinguished in the background of the invention. What the applicant said in response to bus boom is, we're not in our invention telling you exactly where by column and row, but we do give predefined policies that say relative. And I can take you on it just very briefly. If you look at column five, lines 20 to 29, it talks about the region command, and that tells the terminal how to display objects. If you look at column 33 to 38, it says the associated object type is going to be displayed. It talks about how it's going to be displayed. And then all through the description, the host sends attributes to the display terminal. It talks at column five, lines 44 to 47, about the presentation characteristics, and it gives us the commands. Hide, default, radio, no touch, and pop-up. These are all things about how the display is going to look and what it's going to look like. Then at column seven, lines 23 to 33, it talks about the processor may exercise some control over the way the station set displays text, and it gives us more commands there. The more command, the word wrap, the prompt, it tells us how it's going to do it. The bitmap command at column seven, lines 34 to 36, and 49 to 61, talk about how the bitmap can be growable, shrinkable, have a different run length. This all comes from the processor to the terminal. Let's go to the 954 pattern. Can I just make one more point, which I think is critical on this, and then we'll go to 954? In the whole section of column eight on the region command, it tells us that the host is sending to the terminal horizontal attributes, outer, inner attributes, up, down attributes. Those are attributes that say the objects are going to be displayed vertically. Should we do them one after another going down, one after another going up, one after another going across, or one after another to the left? The host is telling the terminal how to do this. The preferred embodiment of that smartphone in figure eight shows the different regions on display, and the host is telling the terminal, break it up into regions and put them in this order, either vertically or horizontally. Then the terminal figures out where exactly it's going to be. That's the distinction, relative versus where exactly. All through the specification, relative commands are being dispensed. Your time, Mr. Damaris. It's usually a good idea, though, to try to satisfy the questions the court's asking. Yes, Your Honor. And I'd like to ask you about 954. Isn't that even clearer, just from looking at the claim, where each successive iteration is necessary within the loop? The claim says that. The terms of the claim are each successive iteration, including the steps up. Absolutely. And then the steps are, and then there's five steps. Five steps. And the first four are, in fact, used in every single calculation of a pulse, which is the fifth step. That's all the claim requires. It doesn't say recalculate the first four each time you do the fifth. I suspect your opponent will disagree with that. I think they do. We'll give him time to do that. I think he will. But I think we have to read these terms, I would suggest, in the context of how they're written. And if you look, that language, and what the court relied on was, again, the prosecution history. But if you look at what the applicant actually said in the prosecution history when they added the new language, they said, look at the specification. And in fact, actually said, look at the flow diagrams. There are two flow diagrams, figure three and figure four. And it's a flow, a box and then an arrow and a box and an arrow. They tell you exactly which step is done when and how it's calculated. So when the applicant added this text in the prosecution history, they told the patent office and anyone who wants to read the prosecution history, to understand this text, look at the flow diagrams. But what if we were to reject, one, your argument about including not meaning comprising. Yes. And to read the claim as being absolutely clear and unambiguous. Do we care, then, what you argue with respect to the prosecution history? Does that matter? If it's the court's conclusion that those words can have no other meaning other than that every single step has to be recalculated, then I would have to agree that there would be no reason to look at the prosecution, except then we move to doctrine of equivalence, because the court gave us summary judgment against us in doctrine of equivalence as well. And this is clearly, at a minimum, in the case of doctrine of equivalence, that the defendants are doing exactly what's in flow chart three and exactly what's in flow chart four in the order it's described in the patent text. And the district court actually found, on the record, the court said, the court held, applying the reasonable competitor test, there was no clear and unmistakable surrender of claim scope, and the court went on to say, and this is at A92 in the court's order, if YPN, and that's one of those steps, if YPN were not calculated in forming each pulse, it would make no difference in comparison to the prior art. That's at A92. So what the court is saying is, even if you require, calculate these four, recalculate them every time even though they're going to hit the same value, it would make no difference regarding the prior art. So this falls within the tangential exception to the Festo rule. At page 572 of the appendix, the argument made to the patent office when that amendment was presented, right in the middle of that page, 572. Yes, Your Honor. There's a sentence right in the middle of that page that says, both these steps are performed during the iteration performing each pulse of the multipulse sequence. Yes. That seems to run counter to what you are doing now and seems to suggest, consistent with what the district court did, that the claim calls for these pulses to be recomputed iteratively throughout the calculation within each frame. I would direct, Your Honor, down to the bottom of that same page, A572, where it says, the relations between the boxes, this is the last line of the 572, the relations between the as described in the specification and the flow charts that clearly show the inventive distinctions. So my response to Your Honor would be, we have to read these two pages in context of what was actually said to the patent office and what a reasonable competitor would actually conclude. When the district court did that, the district court actually held, based on that sentence that I just directed you to, that there would be a reasonable competitor reading this text. There would be no clear and unmistakable surrender of claim scope. So my point would be, even if you find literally that the claim words have to have recalculation of each step under a document of equivalence analysis where the applicant tells the patent office, our inventive concept is these flow charts and that's what we mean to be covering here. They're clearly under this tangential requirement in the post-sophesto world. Clearly, any amendment that would have required those steps to be practiced and repeated each time had nothing to do with getting around the prior art. In fact, the court said, if these steps are to be recalculated, it would have no difference in comparison to the prior art. So we can't make a difference. It's just, clearly there's a tension here because you can't, if you look at the flow charts of figures three and four, clearly it seems to me the way this operates is exactly the way you are arguing it operates. That is, if there's a calculation within the loop shown in figure four, that is then inserted into the flow chart in figure three, is everything in figure four is reflected in box 306. And that's just done once within each frame iteration. And I don't see how you can read the specification to suggest that it operates any other way. I agree with you. Enter stage left, the amendment to claim one and six. Yes. And what are we to make of the fact that it says each successive iteration, including the steps of? In my view, if you read this patent as a person of ordinary skill in the art, you can't come to any other conclusion that it works the way of figure three and figure four. And if you go to the prosecution history and see that the applicant, even when they wrote those terms, said, go to the flow charts. Anybody skilled in the art knows that that. Well, it said go to the flow charts, but also said both of these steps are performed during the iteration for forming each pulse. But if you read it in total, there's not a technician skilled in this art who would conclude, well, we must recalculate these things. Number one, it doesn't make any sense because if you recalculate them, you get the same number over and over and over again. So you'd be doing processing to recalculate the same number with each pulse. So nobody who understands this technology thinks that's the right interpretation. Because what? Because they would say that's what it says, but they can't possibly mean it? No, no. Then they would go to the claim and say, so what does this mean? And they would read those words through the eyes of a person who understands this technology and they wouldn't conclude that it means do these four things over and over and over again and get the same value. Again, it can't possibly mean what it actually says. No, because if you take the broader view of what it means, and this is where I'm going, that word, where's the claim language, it says each successive iteration including the steps up. If you read including broadly the way it's defined in the dictionary, it can mean to influence or be involved in. There is no question that those four steps are involved in every single pulse generation because the values that come out of the equations are plugged into each pulse generation. So a person skilled in the art would look at this and say, when it says each successive iteration including the steps up, I conclude as a person skilled in the art, these first four steps are used in the generation of each pulse because I used the values of each of those calculations in the pulse. I'm not going to recalculate them, but I'm going to use them. The values are only generated once per frame, but those values are then used in every single pulse generation. So that last step where you generate the pulses, every single pulse that's generated uses the values from the first four steps. That's why I'm saying if you read that expression, each successive iteration including the steps up, and you read including the way it's defined in the dictionary, it would allow you as a person skilled in the art to say, I'm going to use the four values that are in steps one, two, three, four when I generate the pulse, and I'm going to use them each time because you have to use them each time for each pulse. And that's the way a person of skill in the art would read it because there's no other way to read it that makes any sense from a technical point of view. So nobody would conclude that you do something different than flowcharts three and four. And then when you read the prosecution history and you see the Africans were actually telling the patent office, do it the way it's in the flowcharts. You have to come away with that conclusion. So I don't think we should be looking at the words in the abstract. We should be looking at the words to the eyes of a person skilled in the art in the patent and the prosecution history. Mr. DeMaris, unless my colleagues are continuing their questions, your time has expired. We'll give you three minutes of rebuttal time, though. Thank you, Your Honor. Mr. Freed. Thank you, Your Honor. You are representing Dill? Dill, yes. And with the court's permission, I'm going to address my remarks to the Ackerman patent and 131 patent, and Microsoft's counsel will address the Atal patent. And I just want to cover briefly some of the issues. And you'll give her the right time. Pardon? You'll give her adequate time. Absolutely. We'll give them as much time as they need. And I hope the court will as well. So I want to cover briefly just three things and cut right to the chase. The three things that were covered during Mr. DeMaris' argument, and that was chunk size region and relative versus absolute. The chunk size disclosure that Mr. DeMaris described that comes in column six and reaches over to column seven is being offered as some reason to deal with this location issue, which is before the court. But in fact, the chunk size issue has nothing to do with that. It has to do with the memory issue. The phrase that the judge pointed out below says that it manages the display itself, and it manages its memory with the participation of the host. And that's what this phrase says. And then it goes on to say how it manages its memory with the participation of the host in this description of chunk size. That's about the memory. It's not about the location. So the chunk size thing is really a red herring. And it doesn't change the fact that this display is managed solely by the term runner. Now let me talk about region for a moment. The bottom line here is that the host only tells you whether you can or should have regions or might have regions. It does not control the placement within the region or even the partitioning of the region. The patent goes out of its way in the passage that you pointed out, Judge Lurie, to say after it gets finished talking about the regions, it goes out of its way in column eight to say, by the way, don't forget the placement of the objects in the region and even the partitioning of the region is going to be under the control of the term runner. So now let's get to relative versus absolute. And that's where the rubber meets the road here. We have to look at what's called the infringement here. There is no doubt on anybody's side that the host, Dell's web servers, control and put every object, and the object is a specific thing in this claim. It's a radio button or it's some other thing you can click on to do something. It places every object precisely within the web page. It tells you exactly where the web page is and exactly where it is relative to everything else. The only thing the terminal does is it's able to move a web page around. So there is no control in this instance in the accused structures or the accused methods of any positioning of an object per se. And if you read the brief carefully, the reply brief, the yellow brief carefully, Lucent finally comes around to admitting that. Because what they do to get around that, recognizing that there's no control over the object, they say, oh, but the web page is just another object. And that could be moved around by the terminal and that's good enough for infringement. But guess what? This claim says what an object is and it's not a web page. It's got to be something precisely within the claim. It's got to be one of these radio buttons, toys, or text entry. So in the end, the way this works, the way the patent works, and the way Busboom was The terminal is the boss of object placement. And in fact, Busboom says you can put it at column six, row seven. In other words, it gives you a precise location for it. That's the argument they made over Busboom. And that's exactly, that's the terminal in the invention. That's exactly what the host is doing in the accused structure. The host says column one. How about the other patent? Pardon? Oh, he's going to talk about the other patent. Yeah. No, well, I think it will be Mr. Thornberry that will talk about the other patent. Quite frankly, I only have one more comment to make. And that is this is not an extraneous limitation that the judge threw in. The whole patent tells you that the boss of location is the terminal. And in fact, the claim says this is not, we're not just defining a terminal in the abstract. We're defining a terminal that's in communication with a host. The claim says a method of operating a host in communication with a terminal then it goes on to give you certain steps. And the patent says it's a principle of the invention, not just some throw in, not just happenstance, but a principle of the invention, that the boss of the location is the terminal. That's not what occurs in the accused structures. What about relative placement? I mean, you alluded to that a moment ago. But, I mean, clearly the terminal is going to control where things appear on the screen. And where things appear on the screen is going to be relative to the size, to the type screen, etc. But does that mean that that's to the total exclusion of any relative placement by the host in accomplishing what this patent intends to accomplish? I don't want you to think I'm avoiding your question. But what it certainly means, and I will get back to your precise question. Whatever it means, it can't mean that it covers where the host does everything about where that thing goes on the page relative to each other, relative to the page. And the terminal has no participation in that. It could just move the pages a block. So the contributions that the host can make are the host can give sort of general paradigms. For example, it could say, have regions. It could say, have vertical. But it can't make the decision as to where to put it within those paradigms. So the only relative thing it could do is give these general outlines. It can't get down to the nitty-gritty and put the thing where it's supposed to go. That's the division of labor that has to be for the terminal alone. Well, can I just follow up on that for a second? Because I just want to make sure I'm clear. But the district court's claim construction says that the host processor cannot control the positioning of the objects. But I'm still not seeing how that satisfies Judge Linsk, what I understood to be Judge Linsk's question, about at least the language in the abstract, which says that the host processor may specify relative rather than specific attributes. The host, for example, the host may be able, if I convert this over to the accused, which we shouldn't be interpreting. Well, no, that's why I'd rather not. I'd rather do it in the context of the district court's claim construction. If we agree that the host can't specify relative attributes, then doesn't that undermine the broad statement that they can't control the positioning of objects? No, I don't think so, Your Honor, because the relative attribute is a general paradigm, such as whether you're going to have a region or not have a region. When the district court said it can't control the location, the district court was talking about where it goes within that general paradigm. Well, the district court didn't say location. He said positioning of objects. Well, he said positioning of objects there, and later on when he went to the file wrapper, he specifically said, and that means, one thing we know it means, it means location, because that's what you said when you were extinguishing Buzzard. So it's the positioning of objects. The district court was using the term positioning of objects with control over the object itself, putting the object in a location. He wasn't saying that the host can have no influence. He didn't have to say that. He's saying that the terminal must be the one that decides where it goes when the final decision is made, and not some general statement by the host that you can have a region, or in terms of the accused device, the host will tolerate movement of a window, but that gives the terminal no discretion over, you can't take anything in that window. The terminal can't lift something in that window and move it somewhere else in the window. And that means that the terminal is not managing the display itself within the meaning of this patent, because managing the display itself within the meaning of this patent, if anything is clear, means being able to pick that object and put it here, here, here, or here, and it can't do that in the accused, and it always does that in the patent. Thank you, Mr. Freed. Mr. Thornberry. Your number is 954. Yes, Your Honor. May it please the Court. I would like to address four points in my time and rest on the briefs for the other points, including the cross-appeal. The four points are, one, Lucent is misreading the use of the word iteration in the claims. Two, Lucent is ignoring its clear statements in the prosecution. Three, Lucent is wrong that the district court's claim construction excludes the specification. And fourth, Lucent is wrong that pitch removal is not at issue. Everything that counsel said here today has to do with pitch calculation, and there's an independent ground to affirm, which is that the defendants don't remove pitch during the iteration either. The first point, the claim range. The claims say that in pulses, are made in successive iterations. The quote is, successive iterations. The claim language then goes on to say that each successive iteration, again repeating that same usage of successive iteration, includes the following five steps. This use of the word iteration, or successive iteration, in that context, makes it clear that those five steps have to be done for every pulse. No matter what else Lucent may say about other uses of iteration elsewhere in the path. Why does it have to be done for every pulse? Because... Why can't it be done once for every frame? Is Your Honor asking for the grammatical answer, or the technical answer? Either way you want to answer it. Well, the grammatical answer from the claim language is that, and the claim is reproduced on page 8 of our red brief, for example, the generating clause says, generating n pulses, and then I go on, by iteratively forming pulses. Look, I mean, clearly the pulses are are repetitively formed within each frame, there are n pulses within each frame, and there is a a removal of pitch information from each of those pulses within each frame. That's fine. So, that takes care of the generating portion, and that takes care of step 5, of the 5 steps that follow. Now, what about steps 1 through 4? The reason why they have to be treated the same as step 5 is that the claim language says, each successive iteration, including the steps of, and then lists the 5 steps. That each successive iteration, which is a pulse iteration, and we know that because the successive iterations are used to make the n pulses. So each pulse iteration includes these 5 steps. And when the claim is written that way, there's no grammatical basis for distinguishing steps 1 through 4 from step 5. But could you read the claim so that those 4 steps, the combining, the forming, the comparing steps, those things only take place once? No, your honor, because... In other words, you have to, you certainly have to combine the information to form signal y, paren, and paren. So, I mean, why not read that to mean it's performed once? And then at the end, it's used to subtract out the pitch information. You could write a claim... I'm not saying that's the right way to read it, but I'm saying why isn't that... And there's two parts to the answer. I mean, clearly you could write a claim that way. Lucent clearly could have done that. They could have said you do these 4 things before the loop, and then you have a loop that does step 5. Because the claim is actually set up to do certain things before the loop. There are elements that we have ellipses out on page 8, the things that you do before the loop. They could have put steps 1 through 4 in that area, above the loop, and then had the... But I guess what I'm saying is that if you could read those 4 steps that way, then that would be consistent with the specification. And if there is that ambiguity, and if it can be read consistent with the specification, isn't that the proper way to read it, rather than to read it in a way that's inconsistent with the specification and reads on something that is not... It's not the way the invention works. And, Your Honor, a couple parts to that answer. I don't believe the claim is ambiguous. It's not subject to any other interpretation, especially in light of the prosecution history and the both quote that Your Honor mentioned in a question earlier. But to turn to the specification, the district court's reading of this claim does not exclude the specification. And I think part of the confusion that Lucent has created is that if you look at the relationship between figures 1, 2, 3, and 4 at column 3, the description of the drawings, we see that figure 1 is a block diagram of the invention. And it's the diagram that appears on the front of the patent. Figure 2 is a block diagram of a processing circuit that quote may be used to implement figure 1. Figures 3 and 4 in turn illustrate the operation of figure 2, not figure 1. And so figure 1 is the invention. Figure 2 is one possible narrower way to implement the invention, and figures 3 and 4 describe figure 2. So figure 1 stands alone as the invention. And the district court was correct that its claim construction does cover figure 1. And one clear way to see that is if you look at the description in the specification of figure 1, in particular at column 7, lines 37 to 39, the statement appears that the process in accordance with equations 4, 5, and 6 is repeated to form element Bi plus 1 Mi plus 1. And that's a complicated notation, but if we go back and look at column 4 starting at line 18 through 29, we see that the I in this context is serving the role of N in the claims. It's counting each pulse. And B is the amplitude of the pulse and M is the location of the pulse. And so what that's saying in column 7 then is that the equations 4, 5, and 6 are repeated to form each pulse. And then if you go back and look at what equations 4, 5, and 6 are in column 5, you see that equation 4 creates the signal Y of N, and equation 6 creates the signal C of N. Now if you go back and look at the claims, you see that there's a direct correspondence to element 1, or excuse me, step 1, that creates Y of N, and step 2 that creates Z of N. So you can tell from the specification right away that it's saying that at least steps 1 and 2 are being repeated to create every pulse. And we can read from the claims that steps 3 and 4 depend on the outcomes of steps 1 and 2, and so those have to be repeated for every pulse as well because the values of 1 and 2 are changing. And so therefore the district court's construction is entirely consistent with this specification. But let's assume, I tried hard to follow the argument you just made in the briefs, tried really hard and it was really difficult. So assume that we don't buy into what you've just said. I mean, assume we're just not compelled by that. So you've got a specification that's inconsistent with the claims. Do you lose or win? We win, Your Honor. And I would point especially to the Electa case where this court did exclude the only embodiment at 214 F. 3rd. 1308 because of clear claim language and clear prosecution history. And we have those here. The grammar of the claim is clear and it's reinforced by the both quote that the court mentioned earlier. Thank you, Mr. Thornburg. Mr. DeMaris. Your Honor, may I have 30 more seconds just to make my last point? 30 seconds, yes. The last point is that everything we've been talking about concerns pitch calculation. Lucent has admitted that the spec shows pitch removal in the pulse-forming iteration. Their brief at 58, their opening brief. They admit that they've surrendered coverage of products that remove pitch outside the pulse-forming iteration, their opening brief at 57. And their expert admitted in the record below that the defendants remove pitch outside their pulse-forming iteration. That's at A. 21. 842 at deposition sites 270 to 71. And the district court relied on this removal point regardless of whether you call it steps 1 through 4 or step 5, at page 895, the district court expressly at the bottom of the page relies on the fact that defendants remove pitch outside the iteration in forming their pulses. So that's an independent basis to affirm. Thank you, Mr. Thornburg. Mr. DeMaris, we'll give you four minutes. Thank you, Your Honor. Just briefly on the last point about infringement. Could have given you three and a half, but we'll give you four. I appreciate that. I'll try to talk quickly. To pick up on the last point about infringement and the alternative basis, the district court found in the opinion, so I won't belabor it, that steps 1 through 4 in Microsoft's products were done, and that's at A. 96. And the district court found that the defendants were not contesting that they do step 5 for the purposes of summary judgment, and that's at A. 93, footnote 3. So I don't think it's proper to bring up now an alternative non-infringement basis that wasn't relied on in the record. And by the way, it's incorrect, and we've addressed why it's incorrect in a brief. So I won't belabor the infringement point. Getting on to their argument about whether the construction is supported by the specification because of figure 1, Microsoft is misreading the specification. In fact, if you look at column 8, lines 3 to 5, it says quite clearly that the boxes in figure 1 follow the flowchart figure 3. So it is incorrect to say that figure 1 is doing something else. The specification, in fact, tells us figure 1 is following the flowchart of figure 3. And lastly, with respect to Your Honor's question about if the claim is inconsistent with the specification, who wins, it is true there is case law from this court that says if it is clear and unambiguous, then we should lose. That's not the case here because the specification describes how the invention works. The claim can be read consistent with that. And the prosecution history here refers specifically to follow the flowcharts. And the district court, when reviewing that prosecution history, made a finding that that was not a clear and unambiguous disavowal. So in this case, on these facts, those cases that say if it's clear, you lose, doesn't apply here because here it's not clear and it's not unequivocal. And the district court found that here when you've got a prosecution history that tells you to go to the flowcharts, that's not an abandonment of flowcharts. So we've got to try to find a way to read that claim consistent with the specification and the prosecution history. Moving on to the first patent, the Acumen 131, I think we can't lose sight of the fact that figure 8 in that patent, which is the smartphone embodied, the judge went into the specification and pulled out a sentence from the smartphone embodied. The way the court then interpreted that sentence rules out the smartphone embodied. It doesn't make sense. Figure 8 shows the smartphone and the host processor has done that region partition. And I think I heard Dell admit during the argument that the host processor is allowed to do relative region assessment and vertical and horizontal. That's all we're asking the claim construction to support. The district court ruled that out. If we look at the patent with respect to figure 8, the text says at column 11, line 29, that those regions in figure 8 are in response to receiving instructions to do so from the transaction processor. The district court has ruled that out. So your view is, I mean, if there's a modification of the claim construction, we just send it back and let the district court in the first instance determine whether or not there's infringement. Exactly. But make no mistake, we're interpreting the broad general term, well-known term, terminal device. You know, that has a definition in the patent, and it tells us it's a workstation, a terminal, or other portable computer. The court then stuffed into there how the device is supposed to work from the preferred environment and then read it wrong because then he read it to exclude the preferred environment. It doesn't make sense. When you look at the invention, the way it's described, from the front all the way to the back, it says right in the abstract, the host processor may specify relative rather than specific. It says in the summary of the invention, after distinguishing the art that gave particular locations, it says right in the summary, while the terminal is solely responsible for display, it does so in accordance with respective predefined policies. That's right in the summary of the invention. Then in the detailed description, they tell us what does that mean. And it says at column three, line 53, in accordance with a set of predefined specifications or policies relates to the way the types of objects or symbols should be presented to the user, i.e. displayed on the display. That was the whole invention. And then if you go all the way through the thing, especially through the specification, you see they have all of these attributes about how things are going to appear. Are they going to appear vertically, horizontally? Are they going to flow down? Are they going to flow across? The host is telling the display how to organize the display, how to set regions, and in which direction the objects ought to be presented. Then it's up to the display to determine where on the grid. So it's a difference between where and relatively what is going to be the display. And it's clear all throughout the specification. And what the district court has done then is take the common well-known term, terminal device, and read into that a limitation about where things are going to be displayed and ruling out the relative display, which the entire description of the patent is about. Terminal is a word we're about to face. Thank you, Mr. DeMaria. With that, Your Honor, I will terminate my time. The case will be taken under advisement. Thank you.